**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

CHRISTOPHER B.,[1]

                        Plaintiff,                     8:19-cv-00905 (BKS)

v.

ANDREW SAUL, Commissioner of Social Security,

                        Defendant.

**Appearances:**

*For Plaintiff:*
Lawrence D. Hasseler
Conboy, McKay, Bachman & Kendall, LLP
307 State Street
Carthage, New York 13619

*For Defendant:*
Antionette T. Bacon
Acting United States Attorney
Vernon Norwood
Special Assistant United States Attorney
Social Security Administration
26 Federal Plaza
New York, New York 10278

**Hon. Brenda K. Sannes, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiff Christopher B. filed this action under 42 U.S.C. § 405(g) seeking review of a

decision by the Commissioner of Social Security (the "Commissioner") denying Plaintiff's

application for Social Security Disability Insurance ("SSDI") Benefits and Supplemental

---

[1] In accordance with the local practice of this Court, Plaintiff's last name has been abbreviated to protect his privacy.

Security Income ("SSI") Benefits. (Dkt. No. 1). The parties' briefs, filed in accordance with

N.D.N.Y. General Order 18, are presently before the Court. (Dkt. Nos. 9, 10). After carefully

reviewing the Administrative Record,[2] (Dkt. No. 6), and considering the parties' arguments, the

Court reverses the Commissioner's decision and remands this matter for further proceedings.

## II.     BACKGROUND

### A.     Procedural History

Plaintiff applied for SSDI benefits on December 31, 2015, and SSI benefits on January

14, 2016, alleging that he had been disabled since August 15, 2014. (R. 240-49). The

Commissioner denied these claims on April 18, 2016. (R. 144-59). Plaintiff appealed that

determination, and a hearing was held before Administrative Law Judge ("ALJ") Mark A.

Clayton on May 22, 2018, at which Plaintiff was represented by counsel. (R. 64-113). On July

23, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of

the Social Security Act. (R. 22-34). Plaintiff then filed a request for a review of that decision

with the Appeals Council, which denied review on May 3, 2019. (R. 7-9). Plaintiff commenced

this action on July 25, 2019. (Dkt. No. 1).

### B.     Plaintiff's Background and Testimony

Plaintiff was 55 years old when he applied for SSDI benefits in 2015. (R. 240). He has an

associate degree in accounting. (R. 69-70). He lives in a house with his mother and helps provide

care for her. (R. 71-72). He cooks occasionally, dresses himself and takes care of his personal

needs, but his brother and aunt do much of his housework. (R. 99-100). He has a driver's license

and drives weekly, usually to go to doctor's appointments and to pick up groceries. (R. 72-73).

When he leaves his house, he uses a cane about "half the time." (R. 68). He was prescribed the

---

[2] The Court cites to the Bates numbering in the Administrative Record, (Dkt. No. 6), as "R." throughout this opinion, rather than to the page numbers assigned by the CM/ECF system.

cane by a doctor, and uses it for stability and to help with "shooting pains down [his] shin" that occur as a result of a screw from ligament surgery 25 years ago backing out of his right knee. (R. 69).

Plaintiff testified that he has not worked since his alleged onset date of disability in August 2014. (R. 75-76). Before that, he was self-employed, "painting homes." (R. 76). He stopped working when he began to "get[] dizzy and fall[] off ladders." (*Id.*). He previously held various jobs, including as a limousine driver, district manager, and account executive. (R. 76-88).

Plaintiff testified that he cannot work because he suffers from issues with his left eye after cataract surgery, side effects from medication (including nausea, dizziness, and confusion), diabetic peripheral neuropathy (polyneuropathy and small fiber neuropathy), chronic fatigue, chronic diarrhea, hand tremors, and difficulty walking and bending. (R. 88-93, 96-98). He testified that his "number one limiting problem" is "his skin" problems resulting from his diabetic peripheral neuropathy. (R. 88). Specifically, the "nerve endings . . . in [his] body" give out "the wrong signals," and "[i]t feels like [he has] a sunburn all the time when [he] sits or when [his] clothes rub against it," causing him to "wear long johns" even when it is "70 degrees out." (R. 89). He feels "burning in [his] feet, 24/7," but the pain occurs "all over" his body, "not just [his] feet." (R. 89, 98). Due to his diabetic peripheral neuropathy, he also experiences what feels like "30 to 40 bee stings every minute" across his body, "mainly where the bones are closest to the edge of the skin." (R. 91). He also describes "electrical shocks coming off [his] hips and [his] ankles and [his] tailbone." (*Id.*). The pain feels like a "sharp stabbing thing." (*Id.*). He reports being able to stand for up to 20 or 30 minutes depending on the weather, sit for up to 15 or 20 minutes, and walk for up to 10 or 15 minutes. (R. 100-01). Plaintiff also testified that he suffers

from depression and anxiety, and that while he had previously "love[d] people," he currently "ha[s] no social life and [does not] desire one." (R. 98).

### C.    Medical Evidence

#### 1.    Onset of Symptoms

Plaintiff initially sought treatment in the Emergency Room on October 20, 2014. (R. 334). He was diagnosed with a viral upper respiratory infection. (*Id.*). He returned to the Emergency Room on November 5, 2014, and was treated by Physician Assistant ("PA") Allison Smith. (*Id.*). He reported that he was experiencing "shooting pains in his arms and legs, fe[lt] very tired and weak," and had burning sensations on the right side of his chest. (*Id.*). PA Smith observed that Plaintiff ambulated with a normal gait, and that he did not exhibit any focal neurological deficits. (*Id.*). On November 6, 2014, a stress echocardiogram revealed no significant cardiac abnormality. (R. 342-44). Plaintiff underwent further testing, and at a follow-up appointment he was informed he was diabetic and was prescribed medication. (R. 360). A stress test also revealed "degenerative changes of the aortic valve." (*Id.*). He was referred to a rheumatology specialist. (*Id.*).

At another follow-up with PA Smith on November 24, 2014, Plaintiff reported pain in his hip and testicle that "feels like a hot burning poker," and was told that the pain "could be a component of neuropathy because of the diabetes." (R. 362). In December 2014, Plaintiff continued to report "burning symptoms" that begin "in the left lower quadrant" when he wakes up in the morning and then "get worse" and "spread[] across his abdomen." (R. 365). However, a December 3, 2014 CT scan of his abdomen "showed a small calcified nodule left lower lobe . . . unchanged since previous CT and otherwise normal abdomen and pelvis." (*Id.*). On December 16, 2014, a magnetic resonance imaging ("MRI") of Plaintiff's thoracic spine revealed a small disc herniation at the T6-T7 level without any significant cord compression, as well as mild

degenerative disc disease in the mid thoracic spine. (R. 366). At the same time, an MRI of

Plaintiff's lumbar spine showed disc bulging at the L2-L3, L4-L5, and L5-S1 levels, as well as

"very minimal degenerative disc disease." (R. 367).

Plaintiff went to the Emergency Room twice more, on December 30, 2014, and January

13, 2015, complaining of "pain and burning," as well as nausea, diarrhea, and upset stomach. (R.

368-69). Plaintiff also complained of pain that began in his left hip and spread to smaller joints

such as the hands, which he rated as a 6/10 "constantly." (R. 368). He said that the pain made

him feel sick to his stomach, making it hard for him to eat and drink. (*Id.*). He reported that even

a t-shirt touching his skin caused him pain. (R. 369). However, when examined, he exhibited no

focal motor deficits, a full range of motion in his upper extremities, and an intact gait. (R. 368).

Furthermore, a CT scan of his abdomen and pelvis on January 12, 2015 came back largely

normal. (R. 424).

### 2. Dr. Christopher Comeau

Plaintiff was seen by Dr. Christopher Comeau, an emergency medicine doctor, twice—on

January 22, 2015 and January 28, 2015—for his fatigue and pain. (R. 371-85). He described "pin

prick pain that occurs in all parts of his body but seems to be most concentrated on the torso,"

that "this first began about 3 months ago and has slowly spread," and that "[i]n some areas it has

also transitioned into a sensation of a cig[a]rette burn." (R. 372, 375). Dr. Comeau observed that

Plaintiff's problem "appears to be some type of neuropathy." (R. 375).

### 3. Dr. Robert DiGiacco

Plaintiff was referred to a neurologist, Dr. Robert DiGiacco, and began seeing him in

March 2015. (R. 469). During Dr. DiGiacco's initial examination, Plaintiff reported "sensory

symptoms described as burning or electrical shocks." (R. 470). Plaintiff described "discomfort at

the back of his shoulder," "electrical shocks in his left hip," a "pins and needle sensation in the

skin of his extremities," and a "burning sensation throughout his body," particularly in his feet. (*Id.*). Plaintiff also reported "difficulty knowing when his urinary bladder was full" and a "history of chronic constipation." (*Id.*). Dr. DiGiacco performed a nerve conduction study, (R. 618-19), which "showed evidence of a polyneuropathy," including evidence of "both motor and sensory fiber involvement." (*Id.*). Dr. DiGiacco diagnosed Plaintiff with "a mixed motor-sensory demyelinating polyneuropathy based on [the] nerve conduction study." (R. 472). He noted that Plaintiff's "symptoms have increased despite recent improvement in his glycemic control." (*Id.*).

Plaintiff was treated by Dr. DiGiacco on over a dozen occasions between 2015 and 2018. (R. 469-84, 555-71, 757-60, 804-06). On May 29, 2015, Dr. DiGiacco observed that while there was "perhaps a transient improvement" following increases in his medication, his "burning dysesthesia at his bony prominences persist" and he "is now more uncomfortable." (R. 475). Dr. DiGiacco noted a "more recent increase [in] burning discomfort at various bony prominences," and observed that Plaintiff's "severe burning sensation [is] aggravated by contact with his [clothes] or certain movements." (*Id.*). On June 25, 2015, Dr. DiGiacco observed that Plaintiff "notice[d] the effectiveness of his pharmacotherapy when he misses or delays a dose," but continued "to have discomfort" despite using the medication. (R. 477). Dr. DiGiacco noted on multiple occasions that Plaintiff appeared to be in discomfort and was frequently adjusting his clothing to avoid contact with certain areas of his skin. (R. 473, 476, 478, 480, 482, 484).

On March 18, 2016, Dr. DiGiacco noted that Plaintiff "again indicat[ed] that his symptoms persist," and that Plaintiff continued to report "sharp stabbing pains that occur intermittently and randomly at various points on his body," "increase[d] burning discomfort at various bony prominences," and an overall "increase in his discomfort." (R. 555). Dr. DiGiacco opined that these symptoms suggest "some element of small fiber neuropathy" in addition to his

polyneuropathy. (R. 556). Plaintiff also reported that he awoke each morning feeling nauseated

and vomiting; Dr. DiGiacco suspected that this could be related to his medication "and a small

fiber neuropathy causing autonomic gastroparesis or some other metabolic disturbance." (*Id.*).

Dr. DiGiacco also observed that Plaintiff "no longer appears uncomfortable or frequently adjust

[*sic*] his clothing," and that "[t]here appears to be a slowly progressive improvement in his

symptoms." (*Id.*). However, approximately one month later, he reported that Plaintiff's

"symptoms have worsened but are not as severe as they were previously," that he "appear[ed]

uncomfortable" during the examination, and that "his symptoms have persisted without

abatement despite several months of excellent glycemic control." (R. 557-58). Dr. DiGiacco

reported improving, but persistent, symptoms throughout the remainder of 2016 and early 2017.

(R. 559-68).

On July 26, 2017, Dr. DiGiacco observed that Plaintiff reported "overall improvement"

of his pain symptoms and that he "no longer shows signs of discomfort by shifting his weight

frequently," but noted that Plaintiff continued to experience intermittent pain in his hands and

feet, a burning sensation on the backs of his legs, and "persistent discomfort." (R. 569). On

December 15, 2017, Plaintiff continued to report an "overall improvement in comfort" but an

ongoing "burning pain in his feet and hands" and "persistent discomfort." (R. 758). In his final

examination of Plaintiff on May 2, 2018, Dr. DiGiacco again reported that, while there had been

"improvement in [Plaintiff's] symptoms," Plaintiff continued to suffer from "persistent

discomfort" despite "good glycemic control." (R. 805).

Throughout his meetings with Plaintiff, Dr. DiGiacco generally observed that Plaintiff's

gait was steady, and that he demonstrated full muscle strength throughout his arms and legs, but

that he had a mild decrease in sensation in his fingertips and decreased sensation in his feet. (R.

474, 476, 478, 480, 482, 484, 556, 558, 560, 562, 565, 568, 569, 758, 805). Through November 2015, Dr. DiGiacco also consistently observed that Plaintiff's deep tendon reflexes ("DTRs") were "markedly reduced in the right brachial plexus and biceps, intact in the left upper extremity, reduced at his knees and absent at his ankles," while from November 2015 onward, he consistently observed that Plaintiff's DTRs were "reduced at his knees and absent at his ankles." (R. 474, 476, 478, 480, 482, 484, 556, 558, 560, 562, 565, 568, 569, 758, 805). From November 2015 onward, Dr. GiGiacco also observed "very low amplitude faster frequency tremors." (R. 484, 556, 558, 560, 562, 565, 568, 569, 758, 805).

### 4.    Dr. Federico Loinaz

Plaintiff also saw Dr. Federico Loinaz, his primary care physician, on almost 30 occasions between March 20, 2015 and May 11, 2018 with various complaints associated with diabetes, diabetic peripheral neuropathy, low back pain, knee pain, chronic obstructive pulmonary disease and gastrointestinal issues. (R. 485-97, 533-49, 591-617, 797-803, 807-14). In their first meeting, Plaintiff reported "pain in the entire abdomen and back" and, specifically, a "burning feeling in the skin of the entire abdomen" that "started 5 months ago and was spreading and is persistent," despite a recent examination that "did not show any abnormalities." (R. 497). Notes from Dr. Loinaz's physical examination reflect that Plaintiff's pain "began as pin pricks several months ago and have engulfed 90 percent of [Plaintiff's] body," and that Plaintiff described his pain as "hot electrical pain, sharp quick needle and ice pick stabs everywhere." (R. 537). Dr. Loinaz also observed that Plaintiff's diabetes was "well controlled" and that Plaintiff had "good sensation of feet," and noted the need for additional pulmonary function and laboratory studies. (R. 497).

On March 31, 2015, Dr. Loinaz noted that Plaintiff was "feeling very well," that "the burning feeling has improved considerably" with medication prescribed by Dr. DiGiacco, and

that Plaintiff demonstrated "no weakness or numbness in extremities." (R. 496). On April 28,

2015, Dr. Loinaz noted that Plaintiff "feels much better," is "getting better with" medication, and

exhibited "no pain or numbness." (R. 495). However, on May 28, 2015, Dr. Loinaz noted that

Plaintiff "did get better from burning feeling all over body but now he has the same feeling

again," though he still had "no weakness or numbness" and the pain could be relieved with extra

medication. (R. 494).

On June 11, 2015, Dr. Loinaz reported that Plaintiff had the "same complaint of burning

feeling on and off in the area of the skin of the abdomen and back, hands, and sometimes chest.

It comes and goes. The carbamazepine has not helped." (R. 493). Dr. Loinaz ordered a CT scan

of the chest and raised the "possibility of peripheral neuropathy" as an explanation for Plaintiff's

problems. (*Id.*). On July 2, 2015, Dr. Loinaz noted that Plaintiff was suffering from "pain that is

variable at the time [sic] of his head, inside of the mouth, and upper and lower extremities" that

"lasts for a few minutes," but that there was "no numbness in his feet" and "no focal neurological

abnormalities"; he opined that "clearly there is a psychosomatic complaint." (R. 492). On July

13, 2015, Dr. Loinaz observed that that pain in Plaintiff's hip continued to "bother[] him all the

time" with "no improvement with medicine." (R. 491). In a subsequent phone call on July 27,

Plaintiff reported to Dr. Loinaz that he had started to have episodes of diarrhea and nausea. (*Id.*).

On August 7, 2015, Dr. Loinaz reported that Plaintiff's "pain is getting much better" and that he

suffered "no aches, pains or numbness." (R. 490). In September and November 2015, Dr. Loinaz

noted that Plaintiff was "feeling much better" and "doing very well," that "the aches and pains

that he had in different parts of his body have considerably improved," and that "the burning

sensation that he did have in the skin of the abdomen has completely disappeared." (R. 488-89).

On January 5, 2016, Dr. Loinaz reported that Plaintiff complained of "low back pain, musculoskeletal, mostly related to bending over" that was "sharp and lasts for a few seconds," that he did "not have any weakness or numbness in the lower extremities," and that he "still has the pain of what is considered to be peripheral neuropathy in the lower extremities." (R. 487). He also wrote that Plaintiff "feels that with all his complaints, that he cannot continue with working and applied for disability. Will fill out the papers." (*Id.*). On May 18, 2016, Dr. Loinaz noted that Plaintiff was "doing well" and that the "peripheral neuropathy is controlled with the different medications that he is taking, so the ache and pain that he used to have does not bother him." (R. 534). Dr. Loinaz also described Plaintiff's complaints of "arthritic pain in both knees, mostly on the right," observed "mild arthritic changes in both knees" following a physical exam, and noted that he gave Plaintiff a prescription to use a cane given the problems in his right knee. (*Id.*). Dr. Loinaz also noted that "the medicine sometimes makes him a little forgetful and confused but is not a major problem." (*Id.*). Dr. Loinaz referred Plaintiff to Thomas Herzog, an orthopedic doctor, to address his knee pain. (*Id.*).

Plaintiff continued to regularly visit Dr. Loinaz throughout the remainder of 2016, 2017 and 2018. On May 24, 2016, Dr. Loinaz wrote that Plaintiff "has pain in the right knee and we have referred him for physical therapy for exercise and ultrasound of the right knee," and that Plaintiff "continues seeing Dr. DiGiacco for peripheral neuropathy and he will see Dr. Herzog for the right knee pain." (R. 616). On September 14, 2016, Dr. Loinaz noted that "[Plaintiff] no longer has aches and pains in any part of his body," but that "he finds that his mind is a little bit foggy and has difficulty in concentrating." (R. 613). On February 23, 2017, Dr. Loinaz noted that Plaintiff felt "tired" and "weak" and that he "continues with aches and pains in abdomen and lower extremities," but that Plaintiff exhibited "good arterial pulses in both feet" and "no focal

neurological abnormalities." (R. 611). He also noted that Plaintiff "is now living with his mother and he is the one who does the cooking and housework," and that "he has not been working because he is taking care of his mother." (*Id.*).

On March 2, 2017, Dr. Loinaz reported that Plaintiff "more or less continues the same, weak and tired" and that he "does not go outside much" because "the winter confines him," but that "in general, he is stable" and that he is "doing housework." (R. 609). On June 12, 2017, Dr. Loinaz reported that Plaintiff "feels mentally depressed with no ambition," "just wants to sleep" and "is not enjoying anything," and that he has "good sensation in toes" but also "wanted to increase [his pain medication] because he is getting sensation of needles to different parts of [his] body." (R. 607). On June 26, 2017, Dr. Loinaz reported that Plaintiff was "feeling better" and "walking now." (R. 605). On July 27, 2017, Dr. Loinaz reported that Plaintiff continued to "take[] care of his mother" and "in general is feeling well" but "[lacks] motivation." (R. 603). On August 29, 2017, Dr. Loinaz reported that Plaintiff "feels mentally depressed" and "is not motivated to do much," but that "his peripheral neuropathy is not giving him pain at present" and there continued to be "no focal neurological abnormalities." (R. 601). Dr. Loinaz's notes from September 19, 2017 and October 9, 2017 focus on Plaintiff's preoperative and postoperative evaluations from cataract surgery, and the October notes report "no focal neurological abnormalities" and "no pain in skin." (R. 597, 599). On November 28, 2017, Dr. Loinaz's notes reflect that Plaintiff had "aches and pains from peripheral neuropathy," that he felt "tired, weak [and] mentally depressed," and that "his life is quite sedentary." (R. 595). Dr. Loinaz's notes on that date also reference filling out disability papers and opine "I don't think [Plaintiff] really can work," but do not indicate whether this opinion was based on Plaintiff's physical ailments or his mental health issues. (*Id.*).

On January 16, 2018, Dr. Loinaz observed that Plaintiff appeared "tired and [a] little down" and "does not feel motivated to do much," but did not report whether Plaintiff was having any issues with pain. (R. 593). On February 19, 2018, Dr. Loinaz's notes focused on Plaintiff's depression symptoms and continued to report "no focal neurological abnormalities," but indicated that Plaintiff again complained of a "burning feeling all over his body." (R. 802). On March 19, 2018, Dr. Loinaz's notes again focused on Plaintiff's depression and indicated that he had missed his diabetes medication, but that he appeared "comfortable." (R. 800). On April 27, 2018, Dr. Loinaz noted that Plaintiff continued to suffer from symptoms of depression and had begun mental health treatment. (R. 798).

### 5. Dr. Thomas Herzog

Plaintiff saw Dr. Thomas Herzog, an orthopedic specialist, on May 26, 2016 for his complaints of pain in both knees. (R. 551-54). Dr. Herzog noted that Plaintiff had a prior ACL repair on the right knee. (R. 551). He also observed that Plaintiff's gait and station were normal, and that his knees were generally normal except for mild tenderness on both knees. (R. 552). Dr. Herzog found that Plaintiff's pain level on his knees was 5/10 and was aggravated by walking and relieved by rest. (R. 552). X-rays of Plaintiff's knees also revealed no significant findings other than evidence of Plaintiff's prior ACL repair. (R. 553). Dr. Herzog ultimately characterized Plaintiff's pain as "moderate" and diagnosed Plaintiff with chronic pain of both knees. (*Id.*).

### 6. Plaintiff's Physical Therapy Records

Dr. Loinaz prescribed Plaintiff physical therapy for his lower back pain. Plaintiff received treatment at an out-patient therapy clinic between February 17, 2016 and March 4, 2016. (R. 620-30). A report from the beginning of Plaintiff's physical therapy notes that he was "at least 20 percent but less than 40 percent impaired, limited or restricted" in his mobility. (R. 621). A report from the end of Plaintiff's physical therapy notes that the intensity of his pain did not

increase or decrease, and the location of his pain did not change, as a result of treatment. (R. 629).

### 7.    Plaintiff's Vision Treatment Records

Plaintiff sought treatment for reported vision problems from the North Country Eye Associates from June 15, 2016 through April 18, 2018. (R. 550, 572-580). Plaintiff was diagnosed with cataracts, and underwent cataract surgery for the left eye on September 20, 2017 and the right eye on October 3, 2017. (R. 632-756, 581-590). In preparation for this surgery, Dr. Loinaz conducted a pre-operative examination of Plaintiff on September 19, 2017, in which he found that Plaintiff was "active, doing housework, errands, helping friends with house repairs, in these activities he does not have chest pressure . . ." (R. 633).

### 8.    Plaintiff's Mental Health Records

After Plaintiff exhibited signs of depression, he was referred to St. Lawrence County Community Mental Health Clinic for mental health evaluation and treatment. He was evaluated by Jonathan Blankenship, LCSW on April 5, 2018. (R 782-796). Blankenship's report noted that Plaintiff had sought therapy from a private therapist when living in Texas several years prior. (R. 782). The report further noted that he suffered "bouts of depressed mood and anxiety associated with [his] chronic medical conditions." (R. 793). He was diagnosed with adjustment disorder with depressive mood and anxiety disorder. (R 795).

### D.    Opinion Evidence

### 1.    Dr. Federico Loinaz (Treating Physician)

On May 24, 2016, Dr. Loinaz completed a Medical Source Statement of Ability to do Work-Related Activities (Physical). (R. 546). Dr. Loinaz's notes reflect that, in preparing this opinion, he and Plaintiff "went over each question together" and "with regard to activities of daily life, [Plaintiff] is the one who answered the questions. I did not put any words for him to

answer." (R. 616). The notes also note that Dr. Loinaz "did not do any examination on" Plaintiff on the day the assessment was prepared.

In his statement, Dr. Loinaz opined that, as a result of his "fatigue, weakness and pain," Plaintiff was only capable of occasionally lifting less than 10 pounds; could stand or walk for less than 2 hours in an 8 hour work day; could sit for less than 6 hours in an 8 hour work day; and was limited in his ability to push and pull with both his upper and lower extremities. (R. 541-42). Dr. Loinaz also opined that Plaintiff should never climb, kneel, crouch, crawl or stoop, and could only occasionally balance, as a result of fatigue and "pain in the back and lower extremities." (R. 542). Dr. Loinaz further concluded that Plaintiff was unlimited in his ability to reach, but could only occasionally handle, finger and feel, as a result of "numbness and pain in the fingers of both hands." (R. 543). He also opined that Plaintiff should have limited exposure to temperature extremes, vibrations, hazards and fumes, noting that "the above environmental changes cause pain in [Plaintiff's] extremities." (R. 544).

Dr. Loinaz also indicated that Plaintiff's pain was "present to such an extent as to be distracting to adequate performance of daily activities or work"; that physical activities such as walking, standing and bending "greatly increase pain causing abandonment of tasks related to daily activities of work"; and that medication impacted Plaintiff's work ability to the extent that it "will severely limit the patient's effectiveness in the workplace due to distraction, inattention, drowsiness, etc." (R. 545).[3]

---

[3] Plaintiff's medical records reflect that he took a variety of medications for his pain and other ailments, including Gabapentin daily for pain relief, Carbamazepine daily for diabetic peripheral neuropathy, Metformin daily for blood sugar, Lidocaine as needed for nerve pain, Duloxetine HCL/Cymbalta daily for depression and anxiety, Aspirin E.C. daily for heart health, Atorvastatin Calcium daily for cholesterol, Empagliflozin daily for blood sugar and heart health, Ondansetron daily as needed for nausea, and Lisinopril and Norvasc daily for high blood pressure, along with various vitamin supplements. (R. 333; *see also* R. 533, 591-92, 797).

On November 28, 2017, Dr. Loinaz completed an additional Medical Examination for

Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination

(R. 548). In this assessment Dr. Loinaz opined that Plaintiff was "very limited" in his ability to

walk, lift, carry, push, pull, bend and climb stairs, and "moderately limited" in his ability to

stand, sit, use his hands, understand and remember instructions, carry out instructions, maintain

attention and concentration, make simple decisions, interact appropriately with others, maintain

socially appropriate behavior, and maintain basic standards of personal hygiene and grooming.

(R. 549). Dr. Loinaz noted no evidence of limitations in Plaintiff's ability to see, hear and speak.

(*Id.*). Dr. Loinaz concluded that Plaintiff was unfit to work as a result of his limitations. (*Id.*).

On May 11, 2018, Dr. Loinaz completed another Medical Assessment of Work-Related

Activities (Physical). (R. 807-14). Dr. Loinaz's notes reflect that the May 2018 assessment was

prepared at the request of Plaintiff's attorneys, that he and Plaintiff spent "about 20 minutes"

preparing the assessment together, that "[Plaintiff] answered questions," and that Dr. Loinaz "did

not do a physical exam." (R. 813).

The conclusions in Dr. Loinaz's May 2018 assessment were largely consistent with those

in his previous assessments.[4] In the May 2018 assessment, he opined that Plaintiff was limited to

occasionally lifting and carrying up to 10 pounds, sitting or standing for up to 30 minutes at a

time without interruption, and walking for 10 minutes at a time without interruption. (R. 807-08).

He also opined that, in an eight hour work day, Plaintiff could sit for two hours, stand for one

hour and walk for one hour, lying down for the remainder of the eight hours. (R. 808). He

---

[4] There were minor differences—for instance, in his May 2016 assessment, Dr. Loinaz indicated that Plaintiff had no limitations on his ability to reach, whereas in his May 2018 assessment Dr. Loinaz stated that Plaintiff was limited to reaching "occasionally." (R. 543, 809). In addition, in the May 2016 assessment Dr. Loinaz stated that Plaintiff had no noise, dust, humidity, or wetness limitations, while he indicated in the May 2018 assessment that Plaintiff could "never" be exposed to dust, humidity, or wetness, and that he could tolerate only a "quiet" level of noise. (R. 544, 811).

observed that Plaintiff required the use of a cane to ambulate further than short distances, that Plaintiff's use of a cane was medically necessary, and that Plaintiff could use his free hand to carry small objects while using the cane. (*Id.*). Dr. Lionaz further noted that Plaintiff was limited to only occasionally reaching, handling, fingering, feeling, pushing or pulling with his upper extremities due to "tingling, numbness, weakness, tremors, and burning feelings," and could only occasionally operate foot controls due to a "burning feeling." (R. 809). He opined that Plaintiff could never climb ladders or scaffolds, stoop, kneel, crouch or crawl, and could only occasionally balance and climb stairs and ramps, due to "pain . . . weakness, [and] numbness." (R. 810). He also opined that Plaintiff's impairments impacted his vision and hearing to the extent that they limited his ability to hear, understand and communicate simple oral instructions and information, avoid ordinary workplace hazards, read very small print, and determine differences in shape and color of small objects such as screws, nuts and bolts. (R. 810). He explained that Plaintiff could only occasionally operate a motor vehicle, and should never be exposed to unprotected heights, moving mechanical parts, humidity and wetness, dust, odors, fumes, other pulmonary irritants, extreme cold, extreme heat, or vibrations, due to "skin burning" and "fatigue." (R. 811). He also noted that Plaintiff could perform basic activities like shopping, using public transportation, walking without assistance, preparing a simple meal and caring for his personal hygiene, but could not "walk a block at a reasonable pace on rough or uneven surfaces" or "sort, handle, or use paper/files" as a result of "weakness in his hands" and "fatigue." (R. 812).

### 2.    Dr. Elke Lorensen (Consultative Examination)

On March 15, 2016, at the Commissioner's request, Plaintiff underwent a consultative internal medical examination by Dr. Elke Lorensen. (R. 498-507). According to Dr. Lorensen's assessment, Plaintiff reported a two-year history of Type II diabetes, as well as surgery and ACL

repair on his right knee in 1986. (R. 498). He also complained of back pain, hand tremors, weakness, neuropathy, and right dropped foot. (*Id.*). Plaintiff reported that he felt "pain in his leg, shooting up all the way to his chest" from his diabetic peripheral neuropathy. (*Id.*). He also complained of chronic low back pain in the lower lumber spine area, which he said had "been going on for awhile," was causing his back to feel "stiff" and "feels like a shooting pain sometimes." (*Id.*). Dr. Lorensen observed Plaintiff using a cane prescribed by his doctor, which Plaintiff said he used for "balance" and "only twice a year when he goes outdoors for a long distance." (R. 499). Plaintiff also reported that he "cooks seven times a week," "cleans and does laundry one to two times a week," "shops once a month," "showers and dresses daily," and "watches TV, listens to the radio, and goes out to the store and to appointments." (R. 499).

Upon examination, Dr. Lorensen observed that Plaintiff's gait and stance were normal, and that he could walk on his heels and toes without difficulty but could only "squat 40%." (R. 499). Plaintiff exhibited no difficulty changing for the examination, getting on and off the examination table, or rising from a seated position. (R. 499). Plaintiff's cervical spine and thoracic spine each exhibited full ranges of motion. (R. 500). Dr. Lorensen found that "[l]umbar spine flexion is 60 degrees, full extension and lateral flexion bilaterally." (R. 500). Straight leg raising tests were negative, bilaterally. (R. 500). Dr. Lorensen noted no sensory deficits, observed that Plaintiff's DTRs were equal in both upper and lower extremities, and found that Plaintiff had full strength in both his upper and lower extremities. (*Id.*). He exhibited full ranges of motion throughout his elbows, forearms, and wrists bilaterally. (*Id.*). He exhibited forward elevation and abduction of his shoulders to 130 degrees (out of 150 degrees). (*Id.*). He also exhibited full ranges of motion in his ankles. His hips and knees exhibited flexion to 90 degrees (out of 120 degrees). (*Id.*). Plaintiff did not exhibit right dropped foot. (R. 500). Plaintiff's hand

and finger dexterity was intact and he demonstrated full grip strength in his hands. (R. 501). Dr. Lorensen also observed "minimal to mild atrophy, isolated to the right calf muscle." (*Id.*). Dr. Lorensen noted that X-rays of the lumbar spine revealed moderate degenerative changes, (R. 500, 505), and that X-rays of the right knee revealed mild degenerative and postsurgical changes. (R. 500, 506). Dr. Lorensen included a list of Plaintiff's then-current medications in his report, (R. 499), but did not include in his analysis any discussion of their possible impact on Plaintiff's functioning.

Based on these observations from his physical examination of Plaintiff and radiological imaging, Dr. Lorensen opined that Plaintiff had "no gross limitations with sitting, standing, walking, and handling small objects with the hands," but "mild to moderate limitations bending, lifting, reaching, and squatting." (R. 501). He also opined that the cane Plaintiff used was "not medically necessary," noting that Plaintiff's gait was "completely normal without the cane and normal with the cane." (R. 499).

### 3.    Cheryl Loomis, PhD (Consultative Examination)

On April 5, 2016, at the request of the Commissioner, Plaintiff underwent a consultative psychiatric evaluation conducted by Cheryl Loomis, PhD. (R. 527-532). Dr. Loomis observed that Plaintiff was cooperative; his overall social skills were adequate; his expressive and receptive language skills were adequate; his thought processes were coherent and goal directed; his mood was euthymic; his affect was appropriate; his sensorium was clear and he was fully oriented; his attention and concentration were intact; his recent and remote memory skills were intact; his intellectual functioning was within the average range with a general fund of information appropriate to his experience; his insight was fair; and his judgment was good. (R. 528-29). She also noted Plaintiff's statements that he showers and dresses himself, cooks, cleans, washes his laundry, drives, uses public transportation, shops, watches television, listens to the

radio, and attends appointments. (R. 529). She further noted his statements that he also used to "enjoy hunting, fishing and snowmobiling," but "cannot anymore due to physical pain." (*Id.*).

Based on her observations, Dr. Loomis diagnosed Plaintiff with adjustment disorder with depressed mood; recommended individual psychological therapy and vocational rehabilitation; and otherwise noted no mental limitations in his ability to follow and understand simple directions and instructions, perform simple and/or complex tasks independently or under supervision, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress. (R. 529-30).

### 4.    Debra Steele (Vocational Expert)

At the hearing on May 22, 2018, the ALJ called Debra Steele, a vocational expert, to testify. (R. 102). She testified that a person of Plaintiff's age, education, and work experience who was limited to work at the "light" exertional level but who was "unable to climb ladders, ropes or scaffolding," was "unable to crawl," could "occasionally climb ramps and stairs . . . stoop, kneel, [and] crouch," could "frequently push/pull and operate foot pedals" and could "frequently push/pull and handle and finger with the upper extremities" could perform Plaintiff's past relevant work as an account executive, both as actually performed by Plaintiff and as generally performed in the economy. (R. 108-09). She further testified that if that hypothetical person was further limited to "only doing simple, routine, repetitive type tasks involving only simple work-related decision making in an environment with only occasional interaction with the general public," that person could not perform any of Plaintiff's past relevant work, nor would the person have any transferable skills from Plaintiff's past relevant work. (R. 109-10). She also testified that if that person was limited to the sedentary exertional level, rather than the light exertional level, the person would not be able to perform any of Plaintiff's past relevant work,

nor would the person have any transferable skills from Plaintiff's past relevant work. (R. 110-11).

Dr. Steele was then asked by Plaintiff's counsel to opine on the abilities of a person who could "lift and carry up to ten pounds," "stand or walk less than two hours out of an eight hour day," "sit less than six hours in an eight-hour day," was "limited to pushing and pulling in the upper, as well as lower extremities," could "never climb ramps, ladders, [or] scaffolds," "could occasionally balance," "could never kneel, crouch, crawl and stoop," could "occasionally handle, finger and feel with both hands, but can never reach," and was "limited to exposure to temperature extremes, vibrations, hazards, like machinery, heights and fumes, odors, chemicals and gasses." (R. 111). Dr. Steele testified that this hypothetical person would not be able to perform any of Plaintiff's past work, and there would be "no competitive employment available." (R. 111-12).

**E.      The ALJ's Opinion Denying Benefits**

The ALJ issued a decision dated July 23, 2018, and determined that Plaintiff was not disabled under the Social Security Act. (R. 25-34). After finding, as an initial matter, that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016, (R. 27), the ALJ used the required five-step evaluation process to reach his conclusion.[5]

---

[5] Under the five-step analysis for evaluating disability claims:

> [I]f the commissioner determines (1) that the claimant is not working, (2) that he has a severe impairment, (3) that the impairment is not one listed in Appendix 1 of the regulations that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008) (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)) (internal quotation marks and punctuation omitted). "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

At step one, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since the alleged disability onset date, August 15, 2014. (*Id.*). At step two, the ALJ determined that Plaintiff had the following severe impairments under 20 C.F.R. §§ 404.1520(c), 416.920(c): diabetes, peripheral neuropathy, degenerative disc disease of the lumbar spine, and degenerative joint disease of the right knee status post reconstructive surgery. (*Id.*). As to Plaintiff's "medically determinable mental impairment of adjustment disorder with depressed mood,"[6] the ALJ explained that he "considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments," and analyzed Plaintiff's functioning under each of the four criteria in turn, giving "significant weight" to the consultative medical opinion generated by Dr. Cheryl Loomis in April 2016. (R. 27-29). The ALJ determined that, because Plaintiff's "medically determinable mental impairments cause no more than 'mild' limitation in any of the [four] functional areas," they were nonsevere. (R. 29).[7]

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (*Id.* (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 404.920(d), 416.925, 416.926)). In so finding, the ALJ specifically considered

---

[6] The regulations "require application of a 'special technique' at the second and third steps of the five-step framework" when evaluating the severity of mental impairments. *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Schmidt v. Astrue*, 496 F.3d 833, 844 n. 4 (7th Cir. 2007)). This technique requires "the reviewing authority to determine first whether the claimant has a 'medically determinable mental impairment.' If the claimant is found to have such an impairment, the reviewing authority must 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),' which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Id.* at 265-66 (citations omitted) (quoting 20 C.F.R. § 404.1520a). The ALJ's written decision must "reflect application of the technique;" "the decision 'must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.'" *Id.* at 266 (quoting 20 C.F.R. § 404.1520a(e)(2)).

[7] Plaintiff does not challenge the ALJ's finding at step 2 that his mental impairments were nonsevere.

whether Plaintiff's impairments and limitations met or medically equaled the criteria of listings 1.04 (disorders of the spine) and 1.02 (major dysfunction of joints). (*Id.*).[8]

The ALJ proceeded to determine Plaintiff's residual functional capacity ("RFC")[9] and found that Plaintiff had the RFC "to perform light work[10] as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds and can never crawl. He can occasionally climb ramps and stairs, stoop, kneel, and crouch. He is able to frequently push/pull and operate foot pedals. He can frequently push/pull, handle, and finger with the upper extremities." (R. 30). In making this determination, the ALJ followed a two-step process "in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the claimant's pain or other symptoms," and then evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations." (*Id.*).

---

[8] Plaintiff does not challenge the ALJ's finding at step 3 that his impairments do not meet or medically equal the severity of a listed impairment.

[9] The Regulations define residual functional capacity as "the most [a claimant] can still do despite" her limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ must assess "the nature and extent of [a claimant's] physical limitations and then determine . . . residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). The Regulations further state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id.*

[10] C.F.R. § 404.1567(b) provides:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

Applying this two-step process, the ALJ found that while the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms," the "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id.*). The ALJ further explained that while the "objective evidence provides some support to the claimant's allegations," this objective evidence did "not support the elevated level of impairment alleged." (*Id.*). The ALJ summarized his findings as follows:

> Despite varying complaints of diffuse pain, weakness, and fatigue, physical examinations and diagnostic imaging have not revealed more than mild to moderate abnormalities. Although he is affected by some loss of reflex and sensation due to neuropathy, he retains full motor strength throughout all extremities with no evidence of significant ambulatory deficits. There is no evidence that he could not perform a range of light work . . . Overall, the claimant's allegations of severe functional limitations caused by diffuse physical pain and fatigue are largely unsupported by objective medical findings. As discussed above, diagnostic imaging and physical examinations are frequently normal. He exhibits full muscle strength throughout with normal gait. There is no evidence of any neurological deficits. He is affected by no more than mild to moderate physical limitations caused by diabetes, neuropathy, lower back pain, and right knee pain with remote history of surgery. There is no objective indication that he could not meet the physical demands of a restricted range of light work.

(R. 31-32).

Addressing two of the medical source functional assessments Dr. Loinaz completed,[11] the ALJ determined that, although Dr. Loinaz was Plaintiff's treating physician, his opinion was entitled to "little evidentiary weight as it is unsupported by objective findings and inconsistent with the longitudinal treatment record as a whole." (R. 33). In discounting Dr. Loinaz's opinion,

---

[11] The ALJ's opinion made no reference to Dr. Loinaz's November 2017 assessment, which was largely consistent with his other two assessments.

the ALJ explained that Dr. Loinaz's findings "appear largely based on the claimant's subjective report," which was "not entirely consistent with the evidence" in the record of "often unremarkable medical findings." (R. 32-33). By contrast, the ALJ gave Dr. Lorensen's consultative medical opinion "great weight," finding it "consistent with the longitudinal treatment record and supported by objective medical findings." (R. 31-32). Finally, while noting that the record contained a "State agency physical residual functional capacity assessment by a single decision maker," the ALJ determined that he "cannot consider or give any weight to the opinion of a State agency" single decision maker and therefore gave "no weight or consideration" to it. (R. 33).

At step four, having determined Plaintiff's RFC, the ALJ determined that Plaintiff was capable of performing his past relevant work as an account executive, because this work did not require the performance of work-related activities precluded by his RFC. (R. 33 (citing 20 C.F.R. §§ 404.1565, 416.965)). Relying on the vocational expert, who testified that "the claimant's past skilled light work as an account executive is not precluded by his light residual functional capacity," the ALJ found that Plaintiff could perform the job "as actually and generally performed," considering his RFC and the physical and mental demands of this work. (*Id.*).

Thus, the ALJ concluded that Plaintiff has "not been under a disability, as defined in the Social Security Act, from August 15, 2014, through the date of this decision." (*Id*. (citing 20 C.F.R. §§ 404.1520(f), 416.920(f))).

## III.    DISCUSSION

### A.    Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine de novo whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record

as a whole, to support the Commissioner's decision and if the correct legal standards have been

applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009). "Substantial evidence is 'more than

a mere scintilla.' It means such *relevant* evidence as a *reasonable mind* might accept as adequate

to support a conclusion." *Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 447-48 (2d Cir.

2012) (per curiam) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very

deferential," and the Court may reject the facts that the ALJ found "only if a reasonable

factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d

1287, 1290 (8th Cir. 1994)). The Court, however, must also determine whether the ALJ applied

the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir.1999). "'Where an error of

law has been made that might have affected the disposition of the case, this court cannot fulfill

its statutory and constitutional duty to review the decision of the administrative agency by simply

deferring to the factual findings of the ALJ.'" *Townley v. Heckler,* 748 F.2d 109, 112 (2d

Cir.1984) (quoting *Wiggins v. Schweiker,* 679 F.2d 1387, 1389 n. 3 (11th Cir. 1982)). The Court

reviews de novo whether the correct legal principles were applied and whether the legal

conclusions made by the ALJ were based on those principles. *See id.; see also Johnson v.

Bowen,* 817 F.2d 983, 985 (2d Cir.1987).

   **B.    Analysis**

   Plaintiff argues that the Commissioner erred in in the following ways in denying his

claim: (1) the Commissioner's findings generally are not supported by substantial evidence; (2)

the Commissioner failed to give appropriate weight to the opinion of Dr. Loinaz, Plaintiff's

primary treating physician; (3) the Commissioner failed to properly assess Plaintiff's RFC; and

(4) the Commissioner failed to make adequate findings regarding Plaintiff's credibility. (Dkt.

No. 9, at 3, 14-23).

### 1. Treating Physician Rule

Plaintiff argues that the ALJ failed to give the opinions of Dr. Loinaz, Plaintiff's primary care physician, appropriate weight pursuant to the "treating physician rule." (Dkt. No. 9, at 15-19). When evaluating the medical evidence in the record, "Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). Because Plaintiff's claim was filed before March 27, 2017, these procedures include the treating physician rule. *See* 20 C.F.R. § 404.1527(a)(2).[12]

The treating physician rule requires that "[t]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment [be] given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Estrella*, 925 F.3d at 95 (quoting *Burgess*, 537 F.3d at 128). "'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'" *Burgess*, 537 F.3d at 128 (quoting *Green-Younger v. Barnhart,* 335 F.3d 99, 107 (2d Cir. 2003)). "Deference to such medical providers is appropriate" because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairments" and "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." *Barthelemy v. Saul*, No. 18-cv-12236, 2019 WL 5955415, at *8, 2019 U.S. Dist. LEXIS 196749, at *22 (S.D.N.Y. Nov. 13, 2019) (quoting

---

[12] The Social Security Administration has revised how it considers and articulates medical opinions. *See* 20 C.F.R. § 404.1520c. Nonetheless, the regulations make clear that "[f]or claims filed before March 17, 2017, the rules in § 404.1527 apply," including the treating physician rule. *Id.*

20 C.F.R. § 404.1527(c)(2)). If an ALJ decides not to give the treating source controlling weight, then she must "'explicitly consider' the following, nonexclusive '*Burgess* factors': (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*, 925 F.3d at 95-96 (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).

If an ALJ fails to assign a treating physician's opinion "controlling weight" and does not explicitly consider the *Burgess* factors, this is "procedural error." *Estrella*, 925 F.3d at 96. If the ALJ committed procedural error and has not provided "good reasons" for the weight given to a treating physician's opinion, the court is "unable to conclude that the error was harmless" and should "remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Id.* (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error."). "If, however, 'a searching review of the record' assures [the court] 'that the substance of the treating physician rule was not traversed,' [the court] will affirm." *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d at 32).

Plaintiff began seeing Dr. Loinaz in 2015 and saw him on nearly 30 occasions between March 20, 2015 and May 11, 2018. (R. 485-97, 533-49, 591-617, 797-803, 807-14). The regulations define a "treating source" as an "acceptable medical source who provides [Plaintiff], or has provided [Plaintiff], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [Plaintiff]." 20 C.F.R. § 404.1527(a)(2). Given these regulations, as well as the fact that the ALJ referred to Dr. Loinaz as Plaintiff's "primary care

physician" and his opinions as "treating source medical opinion[s]," (R. 32-33), the Court assumes that the ALJ considered Dr. Loinaz to be a treating physician.

As such, the ALJ was required to either assign Dr. Loinaz's opinions controlling weight, or "explicitly consider" the *Burgess* factors. *Estrella*, 925 F.3d at 95-96. The ALJ assigned Dr. Loinaz's opinions "little evidentiary weight," (R. 33), and in doing so, failed to explicitly articulate consideration of all the required *Burgess* factors. While the ALJ arguably applied the second and third *Burgess* factors—the amount of medical evidence supporting Dr. Loinaz's opinion and the consistency of his opinion with the remaining medical evidence—and noted in passing that Dr. Loinaz was Plaintiff's primary care physician, he did not explicitly discuss the "frequen[cy], length, nature, and extent of [Dr. Loinaz's] treatment" of Plaintiff or its impact on the ALJ's analysis. *Estrella*, 925 F.3d at 95 (quoting *Selian*, 708 F.3d at 418). Accordingly, the Court finds that the ALJ committed "procedural error." *Id.* at 96.[13]

Thus, the Court must determine whether the ALJ has provided "good reasons" for assigning little weight to Dr. Loinaz's opinions. *Id.* at 96. In this case, the ALJ explained that he gave little weight to Dr. Loinaz's opinions because the "sweeping findings" in Dr. Loinaz's two assessments were "unsupported by objective findings and inconsistent with the longitudinal treatment record as a whole." (R. 33). The ALJ further found that Dr. Loinaz's assessments "appear largely based on the claimant's subjective report rather than often unremarkable medical findings." (R. 32-33). He noted that, during the period at issue, Plaintiff's "[p]hysical

---

[13] The ALJ only addressed Dr. Loinaz's May 2016 and May 2018 assessments, and did not address Dr. Loinaz's November 2017 assessment. (R. 548-49). The Court notes that the November 2017 assessment is largely consistent with the other two assessments the ALJ chose to give little evidentiary weight to, and does not include significant findings or information about Plaintiff's physical limitations that are not captured in the other two assessments. (*Id.*). Therefore, for purposes of this analysis, the Court will assume that, had he addressed the November 2017 assessment, the ALJ would have reached the same decision that he made with respect to the other two assessments, for the same reasons.

examinations and diagnostic imaging have consistently shown generally mild abnormalities that would not reasonably be expected to limit the claimant to the degree alleged," and that Plaintiff "consistently exhibits full motor strength with no evidence of [the] severe lifting restrictions [set forth in Dr. Loinaz's assessments]." (R. 32).

The Court finds that the ALJ's reasoning fell short of articulating "good reasons" for assigning Dr. Loinaz's opinion little weight. *Estrella*, 925 F.3d at 96. As an initial matter, the record supports the ALJ's conclusion that Dr. Loinaz's assessments seem based, at least in part, on Plaintiff's self-reporting about his pain. Dr. Loinaz's treatment notes reflect as much, acknowledging that he and Plaintiff prepared both assessments together, that he did not conduct a physical examination of Plaintiff at the time he prepared either assessment, and that Plaintiff answered at least some of the questions for himself. (R. 616, 813). However, it is well established that "consideration of [a] patient's report of complaints, or history" is, in itself, an "essential diagnostic tool" and a "medically acceptable clinical and laboratory diagnostic technique[]" which entitles a treating physician's opinion to controlling weight. *Burgess*, 537 F.3d at 128 (quoting *Green-Younger*, 335 F.3d at 107); *see also, e.g.*, *Guptill v. Astrue*, No. 08-cv-0077, 2010 WL 1948199, at *4, 2010 U.S. Dist. LEXIS 47658 , at *15-16 (N.D.N.Y. Apr. 28, 2010) (finding that the ALJ erred in rejecting treating physician's opinion, and explaining that "[a]s an 'essential diagnostic tool,'" the treating physician "was entitled to . . . rely upon Plaintiff's subjective complaints and doing so hardly undermines [the treating physician's] opinions"), *report & recommendation adopted*, 2010 WL 1948201, 2010 U.S. Dist. LEXIS 47692 (N.D.N.Y. May 14, 2010). Here, particularly where Plaintiff has a history of diabetic peripheral neuropathy that is documented by a neurologist, Dr. DiGiacco, as well as Dr. Loinaz,

Dr. Loinaz's reliance on Plaintiff's subjective complaints of pain does not constitute a "good reason" to dispense with the deference ordinarily due to a treating physician's opinion.

This does not end the analysis, however. It is also well-established that, especially where a treating physician's opinion is based largely or in part on a plaintiff's subjective complaints, the ALJ *may* give it less-than-controlling weight where the opinion is inconsistent with other substantial evidence, such as the treating physician's own notes or records, the opinions of other medical experts, or other objective medial evidence. *See, e.g., Lewis v. Colvin*, 548 F. App'x 675, 678 (2d Cir. 2013) (affirming ALJ's determination where the treating physician's "final opinion was inconsistent with his own prior opinions and the findings of the other medical examiners, and was based on [the plaintiff's] subjective complaints"); *Halloran*, 362 F.3d at 32 ("[T]he opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). In choosing to reject a treating physician's opinion on these grounds, of course, the ALJ must describe why the treating physician's opinion is unsupported by or inconsistent with the record. *See, e.g., Jennifer D. v. Saul*, No. 19-cv-437, 2020 WL 2553102, at *7, 2020 U.S. Dist. LEXIS 88608, at *20 (N.D.N.Y. May 20, 2020) (finding that ALJ's "conclusory analysis" did not provide good reasons for rejecting treating doctor's assessment of impairments related to severe diabetic neuropathy).

Here, in determining that Dr. Loinaz's opinions were "unsupported by objective findings and inconsistent with the longitudinal treatment record as a whole," (R. 33), the ALJ noted that Plaintiff "consistently exhibits full motor strength with no evidence of such severe lifting restrictions," and that "diagnostic imaging" and "[p]hysical examinations" "have consistently

shown generally mild abnormalities that would not reasonably be expected to limit the claimant to the degree alleged." (R. 32). The diagnostic imaging to which the ALJ referred included a 2014 echocardiogram, which showed "mild" changes, (R. 36, 343), a January 2015 CT scan of the abdomen and pelvis, which was "normal," (R. 36, 424), a March 2016 radiology report that indicated "[m]oderate degenerative changes" in the lumbar spine, (R. 37, 505), and a May 2016 radiology report that indicated that imaging of Plaintiff's knees was "unremarkable." (R. 37, 553). Further, the ALJ correctly recounted the "unremarkable" findings of physical examinations, including "full muscle strength," "normal gate," and "motor testing" which revealed "no focal weakness" or "loss of motor strength." (R. 32).

While the ALJ's observations in this regard are supported by substantial evidence, they fail to take into account limitations that may have resulted from diabetic peripheral neuropathy and that may not have been fully detectable through the kinds of tests the ALJ relied on. Indeed, Dr. Loinaz's opinion that Plaintiff was limited in his ability to sit, stand, or walk, and limited in the amount of weight he can lift, appears to be based not on Plaintiff's complaints of back or knee pain, but on his diabetic peripheral neuropathy. For instance, in the medical report preceding his first medical source statement, Dr. Loinaz states that he has treated Plaintiff for diabetes "with peripheral neuropathy," that he suffers from "pain and numbness in the abdomen and lower extremities," that he has treated Plaintiff for control of diabetes and diabetic peripheral neuropathy, and that his "pain is much better." (R. 540). Following his opinion regarding Plaintiff's exertional limitations, Dr. Loinaz states that Plaintiff's fatigue, weakness, and pain "support" his findings. (R. 542). Throughout his 2018 assessment, Dr. Loinaz relies on findings of "tingling," "numbness," "weakness," and "burning feelings," in support of his opinion regarding Plaintiff's limitations. (R. 807-12). Dr. Loinaz's findings are further supported by the

treatment notes of Dr. DiGiacco, Plaintiff's neurologist, who wrote that Plaintiff reported "a burning sensation and electrical shock sensations suggesting the involvement of small caliber fibers," and concluded that "[t]hese findings are consistent with a diabetic neuropathy." (R. 472). Notably, Dr. DiGiacco rendered this opinion despite finding "5/5 strength" throughout on motor testing, "no focal atrophy," "and "normal muscle tone," and that Plaintiff's gait was "generally steady," suggesting that limitations arising from Plaintiff's diabetic peripheral neuropathy may not be fully captured by the physical and radiological examination results the ALJ relied on. (*Id.*).

There is no indication that the ALJ considered whether, as Dr. Loinaz appeared to believe, diabetic peripheral neuropathy, which principally affected his abdomen and extremities, (R. 497, 493), limited Plaintiff's exertional abilities, such as standing, sitting, and walking or the ability to lift and carry. Thus, the ALJ failed to provide "good reasons" for rejecting Dr. Loinaz's opinion to the extent he relied on physical examinations and diagnostic imaging showing "mild abnormalities" without also considering whether Plaintiff's diabetic peripheral neuropathy would support the limitations Dr. Loinaz identified. *See, e.g., Sullivan v. Berryhill*, No. 17-cv-1524, 2018 WL 6075671, at *2-3, 2018 U.S. Dist. LEXIS 198226, at *4-9 (D. Conn. Nov. 21, 2018) (finding the ALJ failed to provide "good reasons" for not assigning controlling weight to the treating physician's opinion where the ALJ discounted the opinion, in part, on the ground that several findings on physical exam were normal and the ALJ did not "address the other problems [the plaintiff] had with standing and walking, including those stemming from her diabetic neuropathy").

Furthermore, the ALJ's selective focus on a few examples of Dr. Loinaz's treatment notes from 2015 and 2016[14]—which, taken in isolation, suggest that Plaintiff's symptoms were improving and include vague comments that Plaintiff is doing "well"—fails to account for the record as a whole, which suggests that, over the multi-year history of Plaintiff's treatment for pain, his pain had different degrees of severity at different times, and he had varying degrees of success at controlling this pain with medication.[15] In addition, the ALJ's analysis appears to assume that Dr. Loinaz's opinions were based *solely* on Plaintiff's self-reporting and did not take any of Plaintiff's "unremarkable" examination results into account. In making this assumption, the ALJ did not address the fact that, while Dr. Loinaz did not conduct physical examinations of Plaintiff at the time he prepared his two medical assessments, (R. 616, 813), he did conduct numerous physical and neurological examinations of Plaintiff over his three-year course of treatment. (R. 487-90, 492-97, 534-38, 593-613, 798-802).

---

[14] The record contains nearly 30 treatment notes from Dr. Loinaz from 2015 to 2018; the ALJ cited 3 of those notes—three from 2015 and one from 2016— in the decision. (R. 31-32).

[15] *See, e.g.*, (R. 493-96 (noting in March and April 2015 that Plaintiff's burning sensation had improved considerably, but noting in May 2015 that the burning feeling had returned and could be partially relieved with medication, then noting in June 2015 that medication was no longer helping); (R. 475 (observing in May 2015 that while there was "perhaps a transient improvement" following increases in medication, Plaintiff's "burning dysesthesia at his bony prominences persist" and he "is now more uncomfortable")); (R. 488-90 (treatment notes from August through November 2015 reflecting that pain was improving considerably and burning sensation in abdomen had "completely disappeared")); (R. 487 (reporting ongoing pain from diabetic peripheral neuropathy despite previous reports of improvement)); (R. 556-58 (reporting in March 2016 that, after previous improvement, Plaintiff's "symptoms have worsened but are not as severe as they were previously")); (R. 534 (reporting in May 2016 that Plaintiff's diabetic peripheral neuropathy was controlled with medication)); (R. 613 (noting in September 2016 that Plaintiff "no longer has aches and pains in any part of his body")); (R. 611 (reporting in February 2017 that Plaintiff continued to suffer aches and pains in abdomen and lower extremities)); (R. 605 (reporting in June 2017 that Plaintiff requested to increase his pain medication due to "needles" sensation all over his body)); (R. 569 (July 2017 report noting "overall improvement" in Plaintiff's pain systems but that Plaintiff continued to suffer from "persistent discomfort" despite "good glycemic control)); (R. 597 (reporting "no pain in skin" in October 2017)); (R. 595 (reporting ongoing "aches and pains from diabetic peripheral neuropathy" in November 2017)); (R. 802 (reporting in February 2018 that Plaintiff continued to suffer a "burning feeling all over his body")); (R. 805 (May 2018 report again noting "overall improvement" in Plaintiff's pain systems but that Plaintiff continued to suffer from "persistent discomfort" despite "good glycemic control)).

While it is undoubtedly true that "[a]n ALJ does not have to state on the record every

reason justifying a decision," and is not "required to discuss every piece of evidence submitted,"

*Brault*, 683 F.3d at 448, an ALJ also may not "'cherry-pick[] out of the record those aspects of

the physicians' reports that favor[] his preferred conclusion and ignore[] all unfavorable aspects'

without 'explaining his choices.'" *Sullivan*, 2018 WL 6075671, at *3, 2018 U.S. Dist. LEXIS

198226, at *9 (quoting *Ardito v. Barnhart*, 2006 WL 1662890, at *5, 2006 U.S. Dist. LEXIS

39315, at *14 (D. Conn. May 25, 2006)). Nor may an ALJ "substitute [their] own expertise or

view of the medical proof for the treating physician's opinion." *See Shaw v. Chater*, 221 F.3d

126, 134 (2d Cir. 2000). Here, where the ALJ discounted the opinions of Plaintiff's treating

physician as inconsistent with his own view of what the longitudinal treatment record showed,

while selectively focusing on evidence that he felt supported this view and failing to address

substantial evidence that appears to corroborate the treating physician's views, the Court cannot

find that the ALJ expressed "good reasons" for dispensing with the treating physician rule.

Nor does a "searching review of the record" assure the Court that the substance of "the

treating physician rule was not traversed." *Estrella*, 925 F.3d at 96 (quoting *Halloran*, 362 F.3d

at 32). While the extensive records from Plaintiff's neurologist—including a nerve conduction

study performed in March 2015, (R. 618-19)—do not specifically discuss the types of limitations

addressed in Dr. Loinaz's opinions, they do constitute objective evidence of Plaintiff's pain and

discomfort associated with diabetic peripheral neuropathy which, taken as a whole, supports Dr.

Loinaz's findings that this condition caused significant limitations on Plaintiff's ability to

perform physical activities.[16] Furthermore, especially in light of these records, the consultative

---

[16] *See, e.g.*, (R. 472 (observing that Plaintiff suffers from "a burning sensation and electrical shock sensations suggesting the involvement of small caliber fibers," and that "[t]hese findings are consistent with a diabetic neuropathy")); (R. 475 (observing a "more recent increase [in] burning discomfort at various bony prominences," and observed that Plaintiff's "severe burning sensation [is] aggravated by contact with his [clothes] or certain

examination of Dr. Lorensen—which the ALJ gave "great weight" to, (R. 31-32)—does not constitute a "good reason" to discount Dr. Loinaz's opinion. In contrast to Dr. Loinaz's assessment, which was prepared based on his multi-year treatment history with Plaintiff, Dr. Lorensen's opinion was prepared after a single consultative examination in March 2016 (several months before Dr. Loinaz's first assessment, and more than two years before Dr. Loinaz's May 2018 assessment and the ALJ hearing). It also appeared to be based solely on the results of Dr. Lorensen's physical examination of Plaintiff and his review of Plaintiff's lumbar spine and knee radiological reports. (R. 501, 505-06). These tests may not have fully captured the impact of diabetic peripheral neuropathy on Plaintiff's functional limitations, and there is no indication that Dr. Lorensen otherwise considered the possibility of such additional limitations. (R. 501, 505-06). Under these circumstances, Dr. Lorensen's report does not support the ALJ's decision to discount the opinion of Plaintiff's treating physician. *See Estrella*, 925 F.3d at 98 (noting that the Second Circuit has "frequently 'cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination'" (quoting *Selian*, 708 F.3d at 419)); *see also, e.g.*, *Lopez-Tiru v. Astrue*, No. 09-cv-1638, 2011 WL 1748515, at *4, 2011 U.S. Dist. LEXIS 121880, at *13 (E.D.N.Y. May 5, 2011) ("[A]n ALJ may not reject the opinion of a treating physician simply because it is inconsistent with the opinion of non-treating physicians."). Therefore, the Court concludes that the record as a whole does not provide "good reasons" for assigning "little weight" to Dr. Loinaz's opinion.

---

movements")); (R. 473, 476, 478, 480, 482, 484 (observing that Plaintiff appeared to be in discomfort during meetings with Dr. DiGiacco and was frequently adjusting his clothing to avoid contact with certain areas of his skin)); (R. 555-56 (noting that Plaintiff's symptoms "sharp stabbing pains that occur intermittently and randomly at various points on his body" and "increase[d] burning discomfort at various bony prominences" suggest "some element of small fiber neuropathy" in addition to his polyneuropathy)); (R. 557-58 (reporting that Plaintiff's "symptoms have worsened but are not as severe as they were previously," that he "appear[ed] uncomfortable" during the examination, and that "his symptoms have persisted without abatement despite several months of excellent glycemic control")).

As such, the Court concludes that the ALJ erred in failing to properly apply the treating physician rule to Dr. Loinaz's opinions. The error was not harmless because the vocational expert testified that there would be "no competitive employment available" for an individual with limitations largely similar to those found by Dr. Loinaz; thus, a proper application of the treating physician rule may ultimately lead to a different result. *See Lori R. v. Commissioner of Social Security*, No. 18-cv-00153, 2020 WL 4813320, at *11, 2020 U.S. Dist. LEXIS 150215, at *31-32 (D. Vermont Aug. 19, 2020). Accordingly, the Court remands for the ALJ to properly apply the treating physician rule.

### 2. Plaintiff's Credibility

Plaintiff also challenges the ALJ's denial of his benefits on the ground that he failed to make adequate findings regarding Plaintiff's credibility. (Dkt. No. 9, at 3, 22-23). "When assessing a claimant's credibility, the ALJ must consider both his medical records and his reported symptoms." *Pidkaminy v. Astrue*, 919 F. Supp. 2d 237, 248 (N.D.N.Y. 2013) (citing 20 C.F.R. § 404.1529). "A claimant's statements about his condition, on their own, are not enough to establish disability." *Id.* However, a claimant's statements of pain and limitation are entitled to great weight where they are supported by objective medical evidence. *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 56 (2d Cir. 1992). If a claimant's testimony is not supported by objective medical evidence, the ALJ employs a two-step process to evaluate the claimant's reported symptoms: (1) the ALJ determines if the claimant has medically determinable impairments that could produce the alleged symptoms; and (2) if the impairments do exist, the ALJ evaluates the intensity, persistence, and limiting effects of the symptoms to determine the extent to which the symptoms limit the claimant's ability to work. *See Pidkaminy*, 919 F. Supp. 2d at 249 (citing 20 C.F.R. § 404.1529(a)). In so doing, the ALJ considers the following:

1) the claimant's daily activities;

2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms;

3) precipitating and aggravating factors;

4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to relieve his pain or other symptoms;

5) other treatment the claimant receives or has received to relieve his pain or other symptoms; any measures the claimant takes or has taken to relieve his pain or other symptoms; and

6) any other factors concerning the claimant's functional limitations and restrictions due to his pain or other symptoms.

*Id.* (citing 20 C.F.R. § 416.929(c)(3)(i)-(vii)). "After considering the objective medical evidence, the claimant's demeanor and activities, subjective complaints, as well as any inconsistencies between the medical evidence and the claimant's subjective complaints, an ALJ may accept or disregard the claimant's subjective testimony as to the degree of impairment." *Id*. "An ALJ who rejects the subjective testimony of a claimant must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Id.* (internal quotations and citation omitted). In general, courts "afford great deference to the ALJ's credibility finding, since the ALJ had the opportunity to observe [the claimant's] demeanor while [the claimant was] testifying." *Kessler v. Colvin*, 48 F. Supp. 3d 578, 595 (S.D.N.Y. 2014) (citation omitted).

Here, at step one of the two-step process, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (R. 30). At step two, the ALJ evaluated the credibility of Plaintiff's statements concerning the "intensity, persistence, and limiting effects" of the symptoms alleged. (R. 30). In evaluating the credibility of Plaintiff's testimony, the ALJ concluded that Plaintiff's allegations of pain and physical limitations were "not entirely consistent with the medical evidence and other evidence

in the record." (R. 30). More specifically, the ALJ noted that while the "objective evidence

provides some support to the claimant's allegations," "it does not support the elevated level of

impairment alleged." (*Id.*). The ALJ concluded:

> Despite varying complaints of diffuse pain, weakness, and fatigue, physical examinations and diagnostic imaging have not revealed more than mild to moderate abnormalities. Although he is affected by some loss of reflex and sensation due to neuropathy, he retains full motor strength throughout all extremities with no evidence of significant ambulatory deficits. There is no evidence that he could not perform a range of light work . . . Overall, the claimant's allegations of severe functional limitations caused by diffuse physical pain and fatigue are largely unsupported by objective medical findings. As discussed above, diagnostic imaging and physical examinations are frequently normal. He exhibits full muscle strength throughout with normal gait. There is no evidence of any neurological deficits. He is affected by no more than mild to moderate physical limitations caused by diabetes, neuropathy, lower back pain, and right knee pain with remote history of surgery. There is no objective indication that he could not meet the physical demands of a restricted range of light work.

(R. 31-32).

The ALJ's credibility finding appears to be entirely based on his view that Plaintiff's

testimony about his pain and resulting limitations was inconsistent with the other medical

evidence in the record, particularly Plaintiff's physical and neurological examination results.

"[I]nconsistencies between the medical evidence and the claimant's subjective complaints" are

certainly an important factor for the ALJ to consider in assessing credibility. *Pidkaminy*, 919 F.

Supp. 2d at 249. However, in comparing Plaintiff's subjective complaints to the medical

evidence of record, the ALJ assigned "little evidentiary weight" to the opinions of Plaintiff's

treating physician, Dr. Loinaz, both of which, if credited, would constitute strong evidence

corroborating Plaintiff's testimony. (R. 32-33). Given the ALJ's failure to properly apply the

treating physician rule, his evaluation of Plaintiff's subjective symptoms is "necessarily flawed"

because "[t]he ALJ's proper evaluation of [the treating physician's] opinions will necessarily impact the ALJ's credibility analysis." *Mortise v. Astrue*, 713 F. Supp. 2d 111, 124-25 (N.D.N.Y. 2010); *see also Rivera-Cruz v. Berryhill*, No. 16-cv-2060, 2018 WL 4693953, at *8, 2018 U.S. Dist. LEXIS 168606, at *19 (D. Conn. Sept. 30, 2018) (finding that remand was warranted on the issue of the ALJ's credibility determination because the ALJ had failed to properly apply the treating physician rule). Because the Court remands to the ALJ with instructions to reassess the weight of Dr. Loinaz's opinions in light of the treating physician rule, on remand, the ALJ must also "reconsider the credibility determination in light of any revisions he makes to the weight accorded to [Dr. Loinaz's] opinions." *Id.*

Moreover, in limiting his assessment of Plaintiff's testimony to a comparison with the objective medical evidence, the ALJ did not address the additional statutorily enumerated factors he was required to consider when evaluating Plaintiff's credibility. *See, e.g.*, *Carter v. Berryhill*, No. 15-cv-1256, 2017 WL 2693550, at *8, 2017 U.S. Dist. LEXIS 96115, at *22-23 (N.D.N.Y. June 22, 2017) (finding that, where "[t]he only factor [the ALJ] considered in his credibility assessment was the objective medical evidence," his "failure to discuss the required factors is . . . grounds for remand" (citations omitted)). For example, the ALJ did not appear to engage in any analysis of the record evidence regarding Plaintiff's ability to perform daily activities,[17] nor did he fully consider the "type, dosage, effectiveness, and side effects" of the various medications Plaintiff took over his full multi-year history of treatment for his pain and how these medications

---

[17] *See, e.g.*, (R. 68-69, 72-74, 94-96, 98-100, 499, 529, 633). While the Court notes the Commissioner's argument that "evidence that Plaintiff is capable of engaging in many and varied activities" supports the ALJ's determination that Plaintiff is not disabled, (Dkt. No. 10, at 14), this argument misses the essential problem—that, here, the ALJ *made no such determination at all*. *See Borrero v. Colvin*, 16-cv-2616, 2017 U.S. Dist. LEXIS 114608, at *57 (E.D.N.Y. July 21, 2017) (explaining that where the Commissioner's brief "performs the type of credibility analysis that the ALJ neglected to do, in order to justify the ALJ's finding of non-credibility," "[the Commissioner's] post-hoc explanation and analysis cannot cure the deficiency of the ALJ's decision").

impacted Plaintiff's ability to function. *See, e.g.*, *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 438 (S.D.N.Y. 2010) (ALJ erred where he "did not meaningfully evaluate [Plaintiff's] ability to perform daily activities," including testimony regarding difficulty with those activities, or the various medications Plaintiff had taken over a "two-year period and how they affected her overall functioning").[18]

The Court emphasizes that the task of weighing the relevant evidence, including the evidence referred to above and all other relevant record evidence, and making an ultimate determination as to the credibility of Plaintiff's subjective testimony is reserved for the ALJ. *See, e.g.*, *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the Secretary, not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."). However, in light of the fact that the ALJ's assessment of Plaintiff's credibility is inextricably intertwined with the ALJ's evaluation of the treating physician, and in the absence of any discussion of the above-referenced credibility factors, the Court is unable to conclude that the ALJ properly evaluated Plaintiff's credibility. Accordingly, on remand the ALJ should revisit his credibility determination after following the treating physician rule, and in light of the above-referenced factors.

---

[18] The Court also notes Plaintiff's argument that "[a] plaintiff with a good work history is entitled to substantial credibility when claiming inability to work." (Dkt. No. 9, at 23 (quoting *Giambrone v. Colvin*, No. 15-cv-05882, 2017 WL 1194650, at *21, 2017 U.S. Dist. LEXIS 48039, at *59 (E.D.N.Y. Apr. 3, 2017)); *see also Milien v. Astrue*, No. 10-cv-2447, 2010 WL 5232978, at *10, 2010 U.S. Dist. LEXIS 133059, at *33-34 (E.D.N.Y. Dec.16, 2010) (finding error where the ALJ failed to consider that plaintiff "left her long-standing place of employment only when her symptoms took a dramatic turn for the worse"). Here, while the record reflects that Plaintiff has an extensive and varied work history, Plaintiff's work records do not specify the specific dates he worked at each of his jobs, nor is it clear whether there were any periods of unemployment prior to August 2014. *See* (R. 76-87 (Plaintiff's hearing testimony about his job history), 248-58 (earnings records), 273-81, 330 (work history report)). Therefore, on this record, the Court cannot conclude that the ALJ's failure to give Plaintiff "substantial credibility" based on his work history constitutes error. On remand, the ALJ should consider Plaintiff's work history (including by attempting to fill any gaps in the record as necessary) and determine how, if at all, Plaintiff's work history impacts his credibility.

### 3.    Remaining Arguments

As the Court has determined that remand is required, the Court does not reach Plaintiff's remaining arguments that the Commissioner's findings are not supported by substantial evidence and that the Commissioner failed to properly assess Plaintiff's RFC. (Dkt. No. 9, at 3, 14-15, 19-21).

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED,** and this action is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Decision and Order;

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Dated: September 18, 2020
Syracuse, New York

Brenda K. Sannes
U.S. District Judge